99 S.W.3d 15 (2003)
In the Interest of J.L.F., A Minor,
The Greene County Juvenile Office, Petitioner-Respondent,
v.
R.L.F., Respondent-Appellant.
No. 24927.
Missouri Court of Appeals, Southern District, Division Two.
January 15, 2003.
Motion for Rehearing and Transfer Denied February 6, 2003.
*16 Bruce Galloway, L.L.C., Springfield, for appellant.
Bill Prince, Springfield, for respondent.
KENNETH W. SHRUM, Judge.
R.L.F. ("Mother") appeals a judgment that terminated her parental rights to J.L.F., her daughter.[1] Mother insists there was insufficient evidence presented to support the trial court's finding that two termination grounds were proven, namely, Mother had abused or neglected J.L.F. (§ 211.447.4(2)), and J.L.F. had been under juvenile court jurisdiction for one year without Mother rectifying the conditions that led to the court's assumption of jurisdiction (§ 211.447.4(3)). Because the abuse or neglect ground was proven by clear, cogent, and convincing evidence, we *17 need not look further.[2] We affirm the judgment of the trial court.

STANDARD OF REVIEW AND STATUTORY PROVISIONS
A trial court's decision to terminate parental rights is reviewed under the standards of Murphy v. Carron, 536 S.W.2d 30 (Mo.banc 1976). In re S.L.J., 3 S.W.3d 902, 907 (Mo.App.1999). Thus, we will affirm the judgment unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. Id. at 907[5]. The facts and reasonable inferences are viewed in the light most favorable to the judgment with due regard given to the trial court's determination of witness credibility. In re A.R., 52 S.W.3d 625, 633[2] (Mo.App.2001).
A juvenile court has statutory authority to terminate a parent-child relationship "if the court finds that the termination is in the best interest of the child and when it appears by clear, cogent, and convincing evidence that grounds exist for termination pursuant to subsection 2, 3, or 4 of [§ 211.447]." § 211.447.5; In re J.M., 1 S.W.3d 599[2] (Mo.App.1999). The clear, cogent, and convincing standard is met when the evidence "`instantly tilts the scales in the affirmative when weighed against the evidence in opposition, and the fact-finder's mind is left with an abiding conviction that the evidence is true.'" In re C.M.B., 55 S.W.3d 889, 893[3] (Mo.App. 2001) (citations omitted).
Even though a trial court finds multiple statutory grounds exist for termination of parental rights, an appellate court does not have to decide if sufficient evidence supports each finding. We can affirm if any one ground thus found is supported by evidence that meets the clear, cogent, and convincing standard. In re J.K., 38 S.W.3d 495, 499[5] (Mo.App. 2001). In such an instance, we need not reach the merits of the other grounds found by the trial court. Id.
A juvenile officer or the Division of Family Services ("DFS") may file a petition to terminate parental rights when it appears a "child has been abused or neglected." § 211.447.4(2). The abuse or neglect ground for termination contains statutory subparagraphs that are factors a court "shall consider and make findings on" when adjudicating a termination of parental rights case. § 211.447(2) and (3); In the Interest of J.N.C., 913 S.W.2d 376, 379 (Mo.App.1996). However, the subparagraph (a-d) factors under § 211.447.2 "are not independent grounds for termination, but merely categories of evidence to be considered together with all other relevant evidence." Id. at 379[3].

RELEVANT FACTS
Our recounting of the evidence in this case focuses on that which is relevant to the abuse or neglect ground. On June 4, 1999, at 2:40 A.M., Mother was driving a friend's car when a police officer stopped her because the vehicle had a faulty muffler. Her eight and one-half month old daughter, J.L.F., was in the back seat of the car. During the stop, the officer learned that there were two outstanding warrants for Mother. He also noted Mother's hands were "trembling and her eyes appeared to be glassy with poor reaction to light." The policeman arrested Mother per the warrants and for driving *18 without a license. He also conducted a consent search of Mother's pursewhich was found beneath J.L.F.'s car seatand discovered three syringes therein each containing a fluid. He also noted a fresh needle mark on Mother's arm.
Mother's friend had a purse that was located next to J.L.F.'s car seat. A search of it disclosed a single syringe with liquid. The friend admitted that she "shot up meth 2 days ago." Following these discoveries, the officer arrested both Mother and her friend for possession of a controlled substance. Because Mother was unable to find anyone to care for J.L.F., an employee of DFS arrived at 4:00 A.M. The worker promptly took physical custody of J.L.F. and placed her in a licensed foster home where she has remained ever since.
On June 24, 1999, J.L.F.'s foster parents had her evaluated by an occupational therapist. J.L.F. was approximately five months behind in development. DFS also learned at that time that Mother had wholly failed to immunize J.L.F.
When DFS caseworker Carolyn Key was assigned to J.L.F.'s case in July of 1999, Mother was "very resistant to ... suggestions of services[ ]" from DFS and would become "very angry and hostile[.]" However, Mother was in "minimal compliance" with several suggestions made by DFS. For instance, Mother completed an assessment from an alcohol and drug abuse center, but failed to receive outpatient treatment the center recommended. Mother was also referred to parenting classes wherein she was either late or absent on eight out of twelve occasions. Mother also failed to turn in homework, did not participate in the classes, and "did not take the information seriously." DFS further requested that Mother obtain suitable housing, but in August of 1999, she had changed locations and was "living in an unapproved residence."
In September of 1999, Mother missed all but one of her weekly visitations with J.L.F. In fact, from July of 1999 to December of 1999, Mother missed nearly half of her scheduled visitations with J.L.F. Thereafter, the visitations were decreased. Also, during this timespan, Mother did not provide any type of support for J.L.F. In an October review of Mother's progress, DFS noted Mother had moved again, was living with an unidentified male, was unemployed, and failed to attend parenting classes.
On November 24, 1999, Mother and DFS entered into a treatment plan to aid Mother in regaining custody of J.L.F. The treatment plan provided, inter alia, that Mother was to maintain visitation with J.L.F. at least twice per month, maintain gainful employment, fully cooperate with all treatment recommendations, stabilize her residence, and attend parenting classes. In December, Mother missed all of her visitations with J.L.F., and she did not comply with DFS recommendations regarding a psychological evaluation. Beginning in January, Mother became more consistent on visitation, but continued to refuse treatment recommendations and did not comply with the psychological evaluation until April of 2000. Mother also failed to comply with the employment requirements of the treatment plan, and it was not until October of 2000 that Mother successfully completed her parenting classes per the treatment plan. Nor did Mother comply with other treatment recommendations for substance abuse counseling.
In June of 2000, at the one-year meeting regarding J.L.F.'s case, Mother was advised that termination of her parental rights to J.L.F. was the goal of the case. At that meeting, Mother's attitude changed. Thereafter, Mother pled guilty to possession of a controlled substance, and she entered the "Drug Court" program *19 on August 16, 2000. Since entering that program, Mother's "willingness to look at the need for changes in herself has drastically increased ... [and] her insight has continued to grow." As part of that program, Mother was required to submit to substance abuse counseling and urinalysis, report to a judge and probation officer, and attend Alcoholics Anonymous meetings. Failure to do so would result in incarceration.
In May of 2000, Mother began residing with a paramour, T.T.; the two had a child in August of 2000; and the couple married in August of 2001. When the child was born, Mother was belligerent and argumentative with the nursing staff, removed the newborn from an oxygen tent in intensive care, and proceeded to feed the child. Also, the father, T.T., "reeked of alchohol" when Mother initially came to the hospital. Further, when visiting the child, T.T. smelled strongly of alcohol. Greene County DFS prepared to take custody of the newborn, but Mother and the child had been released. The DFS office of Mother's residence (Polk County) decided not to take custody.
Since Mother was advised her parental rights to J.L.F. were to be terminated and a petition to do so was filed, she has complied with her treatment plan. Within that first year, however, J.L.F. bonded significantly with her foster family, and she maintains no bond with Mother, but interacts with her much like a friend. At the time of the last hearing, J.L.F. was approximately three and one-half years old and had spent all but eight and one-half months of her young life with her foster family. An expert testified that removal of J.L.F. from this family would be disastrous to J.L.F. and would have lifelong consequences to her.
The juvenile court found that J.L.F. had been "abused and/or neglected and was adjudicated to have been abused and neglected [.]"[3] (Emphasis supplied.) Under § 211.447.4(2)(a)-(d), the court found only one subparagraph applicable, specifically, that Mother neglected the child by exhibiting poor parenting skills, an unsettled lifestyle, and failed to change these habits.[4] The court determined it was in J.L.F.'s best interests to terminate Mother's parental rights.

DISCUSSION AND DECISION
Mother alleges the court's finding that she "abused and/or neglected" J.L.F. is not supported by clear, cogent, and convincing evidence. For support of her argument, Mother points to evidence demonstrating she complied with all the requirements of her treatment plan after DFS decided to terminate her parental rights and filed a petition for such. She also attacks the court's finding on the basis that it is conclusory in nature, and in the alternative, she asks this court to remand the case for further proceedings.
Neglect is defined as the "failure to provide, by those responsible for the *20 care, custody, and control of the child, the proper or necessary support, education as required by law, nutrition or medical, surgical, or any other care necessary for the child's well-being." In re J.L.B., 9 S.W.3d 30, 35 (Mo.App.1999). Neglect is described as the failure to perform the duty with which a parent is charged by law and conscience. In re S.L.N., 8 S.W.3d 916, 922 n. 5 (Mo.App.2000).
Here, the evidence overwhelmingly supports the finding that Mother neglected J.L.F. She was found driving a car, apparently under the influence of a controlled substance, at 3:00 A.M. with her young daughter in the back seat. She pled guilty to possession of a controlled substance as a result thereof. At that time, J.L.F. was developmentally behind by approximately five months, and J.L.F. had never been immunized. These uncontradicted facts alone demonstrate J.L.F. was the victim of neglect.
Moreover, for one year after J.L.F. was placed in DFS custody, Mother provided no financial support such as food, clothing, shelter, or education. She missed nearly half of her visitations with J.L.F. until January of 2000, a period of nearly six months. For over one year, she refused to comply with DFS recommendations in order to regain custody. She failed to maintain stable employment, stable residences, or a stable lifestyle. She allowed her child to stay in DFS custody for over one year without regard for J.L.F.'s financial, emotional, or physical well-being. This is neglect. This neglect was repeated and continuous.
In essence, Mother now argues that her recent conduct and stabilization of her life erases the earlier neglect of J.L.F. She insists the evidence of her reformation precludes a finding that a statutory ground exists based upon the clear, cogent, and convincing standard. We disagree.
Although contrary evidence may be presented to the court supporting a different conclusion, this does not necessarily demonstrate that the trial court's determination is not supported by clear, cogent, and convincing evidence. C.M.B., 55 S.W.3d at 893[5]. Mother's conduct after the filing of a termination petition cannot constitute the sole consideration of the court's decision. In re N.M.J., 24 S.W.3d 771, 780[10] (Mo.App.2000). A court must look at the totality of a parent's conduct both prior to and after the filing of the termination petition. Id. at 780[11]. "Otherwise, a parent can always argue that she [or he] has reformed since the filing of the petition, reformation usually occurring while the child is away." In the Interest of J.M.L., 917 S.W.2d 193, 196[6] (Mo.App.1996). For these reasons, a parent's conduct after the termination petition has been filed may not be compelling. N.M.J., 24 S.W.3d at 780[13].
This is especially true, when as here, Mother's conduct improved in large measure due to the requirements of the Drug Court program. The requirements of the Drug Court were, in many respects, similar to those of the treatment plan. If Mother failed to comply, then she faced incarceration. At the termination hearing, Mother continued to deny any responsibility for being arrested on the night that J.L.F. was placed in DFS custody. Moreover, she claimed she did everything in her power to regain custody of J.L.F. during that first year.
There was also evidence that Mother's conduct regarding her offspring may have been neglectful or abusive. Mother put her newborn child's life in jeopardy by removing her from an oxygen tent while she was in intensive care to feed her. She resided with and married a man who "reeked of alcohol" at the hospital when *21 visiting his child. These events occurred in August of 2000.
The court was free to disbelieve that Mother's improvement was due to a desire to care, love, and protect J.L.F. S.L.J., 3 S.W.3d at 907; In the Interest of T.H., 980 S.W.2d 608, 613 (Mo.App.1998). This principle of law is especially applicable given the aforementioned facts regarding Mother's reason for change and conduct regarding her newborn child. "The past provides vital clues to the present and future. Past events shape the future. `To allow only review of very recent events is both short sighted and dangerous.'" J.M.L., 917 S.W.2d at 196 (citations omitted).
Finally, we note an additional allegation of error in Mother's point relied on. She alleges the juvenile court erred because it "presented conclusory findings when it rendered a decision contrary to the weight of the evidence." However, Mother leaves this alleged error undeveloped in the argument section of her brief. Because Mother failed to develop her contention raised in the point beyond mere conclusory arguments, this court deems the allegation of error to be abandoned. In re K.C.M., 85 S.W.3d 682, 699[27] (Mo.App.2002); In re T.E., 35 S.W.3d 497, 506[17] (Mo.App. 2001). Even so, we have, ex gratia, reviewed the record. We note the findings made here were sufficiently specific to assure this court that the juvenile court properly considered all of the evidence and factors in deciding to terminate Mother's parental rights. See, e.g., K.C.M., 85 S.W.3d at 695-98; In re A.S.O., 52 S.W.3d 59, 65 (Mo.App.2001).
Reviewing the facts and all reasonable inferences in the light most favorable to the juvenile court's judgment, we conclude that the court's findings under § 211.447.4(2) and subparagraph (d) are supported by clear, cogent, and convincing evidence. We are not left with the firm belief the judgment is wrong. Point denied.
The judgment of the juvenile court terminating Mother's parental rights is affirmed.
PREWITT, P.J., and PARRISH, J., CONCURS.
NOTES
[1] In the same judgment, the court terminated the parental rights of J.L.F.'s biological father. The father does not appeal; consequently, that part of the judgment is final.
[2] Mother specifically acknowledges she does not challenge the trial court's best interest finding under § 211.447.5; accordingly, we only review that part of the judgment relating to the statutory ground for termination. See In the Interest of B.L.B., 834 S.W.2d 795 (Mo. App.1992).
[3] The italicized portion of the court's finding was surplusage. This follows because until 1998 the abuse or neglect ground for termination was found in § 211.447.2(2). Before 1997, § 211.447.2(2) read, inter alia: "The child has been adjudicated to have been abused or neglected[.]" In 1997, the phrase "adjudicated to have been" was eliminated to leave the version of the statute now found in § 211.447.4(2), i.e., "[t]he child has been abused or neglected."
[4] The statute provides as follows:

"Repeated or continuous failure by the parent, although physically or financially able, to provide the child with adequate food, clothing, shelter, or education as defined by law, or other care and control necessary for the child's physical, mental, or emotional health and development."
§ 211.447.4(2)(d).